UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  1:22-cv-20465-JB

JULIO JUAN GARCIA,

      Plaintiff,

v.

ALAIN RODRIGUEZ,
*et al.*,

      Defendants.

_____/

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS JESUS MARTINEZ, CHRISTOPHER FERNANDEZ, GREGORY WADDELL, ALEJANDRO ESTEVEZ,MIGUEL REYES, ROBERT LOVE, AND ALAIN RODRIGUEZ

**THIS CAUSE** is before the Court on the Motion for Summary Judgment ("MSJ") filed by Defendants Jesus Martinez, Christopher Fernandez, Gregory Waddell, Alejandro Estevez, Miguel Reyes, Robert Love, and Alain Rodriguez (jointly, the "Defendants").  ECF No. [176].[1]  The MSJ is fully briefed with incorporated memorandum of law, supporting Statement of Material Facts, and exhibits.  ECF No. [175].  Plaintiff Juan Julio Garcia ("Plaintiff") has filed an unsworn Response in opposition ("Response"), ECF No. [201], with supporting Appendix, ECF No. [202], and Plaintiff's unsworn Statement of Material Facts in Dispute, ECF No. [209].

---

[1] Unless otherwise noted, the Court relies on the pagination generated by the Case Management/Electronic Case Files ("CM/ECF") system, which appears in the header on all filings. The notation "ECF No." refers to the specific docket entry on CM/ECF.

Defendants filed a Reply,  ECF No. [204], and Plaintiff a Surreply.  ECF No. [211]. The Court has carefully reviewed the Parties' written submissions, the record, and relevant authorities. For the reasons discussed below, the Defendants' Motion for Summary Judgment is **GRANTED**.

## I.   BACKGROUND

At issue in the MSJ is Plaintiff's Fourth Amendment warrantless entry claim and Eighth Amendment excessive use of force claim arising from Plaintiff's October 20, 2020 arrest by law enforcement officials.  ECF No. [176].  In the Third Amended Civil Rights Complaint ("Third Amended Complaint") brought pursuant to 42 U.S.C. § 1983, Plaintiff alleged that, on October 20, 2020, at approximately 6:00 p.m., the Defendants, members of the Metro-Dade Police Department's ("MDPD") Narcotics Bureau entered apartment 548 (the "Apartment") at 2001 Ludlam Road in West Miami.  ECF No. [85] at 1.  According to the Plaintiff, Defendants were in plain clothes and failed to announce that they were law enforcement.  *Id.*  Plaintiff alleges that the entry was unlawful in that the officers had no warrant and no probable cause because there had been no investigation on anyone residing in the apartment.  *Id.*

Plaintiff maintains he was awakened after hearing Defendants enter the Apartment.  *Id.*  Fearing for his life, Plaintiff claims he armed himself.  *Id.*  Plaintiff states he returned fire after being shot in the leg by Defendant Fernandez.  *Id.* at 1, 6. Plaintiff claims he continued shooting until Defendants retreated from the Apartment.  *Id.*  at 1.  Next, Plaintiff states he called 911 asking for the police and for medical assistance.  *Id.*  Plaintiff alleges he received no medical assistance for two

hours so he called 911 a second time. *Id.* Shortly after the second call, Plaintiff alleges that all Defendants, except Rodriguez (the "lead detective"), entered the Apartment a second time, and "[b]eat, kicked, and tortured Plaintiff for several minutes." *Id.* As a result, Plaintiff maintains he sustained fractured ribs, a lacerated spleen, and "[o]ther severe life-threatening injuries." *Id.*

In their MSJ, Defendants argue they are entitled to summary judgment as a matter of law on the Fourth Amendment and Eighth Amendment claims because the record fails to demonstrate a genuine issue of material fact as to Plaintiff's Fourth and Eighth Amendment claims and they are otherwise entitled to qualified immunity as they were acting within their discretionary authority and did not violate any constitutional rights of the Plaintiff. ECF No. 176.

In his Response, ECF No. [201], Plaintiff argues that there remains a material dispute as to whether the same undercover officers unlawfully entered the Apartment, and used excessive force during two entries into the Apartment,

Based on the Court's review of the record, and for the reasons discussed below, the Court grants Defendants' MSJ.

### A.    *Factual Background*

Before summarizing the material facts, clarification is necessary regarding what has been properly disputed and what has not. In their Reply, ECF No. [204], Defendants argue that Plaintiff's Response, ECF No. [201], in opposition to Defendants' MSJ, ECF No. [176], is improper and should not be considered by the

Court because it does not comply with Rule 56.1 of the Federal Rules of Civil Procedure.[2]  ECF No. [204] at 2.

It is well-settled that any facts included in the moving party's statement of material facts that are not controverted in the non-moving party's response or sworn pleadings may be deemed admitted.  *See* Fed. R. Civ. P. 56(c)(1)(A), (e)(2), (3).  "A party asserting that a fact . . . is genuinely disputed *must* support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations . . . admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute. . .." *See* Fed. R. Civ. P. 56(c)(1)(A)–(B) (emphasis added).

Further, the Court's March 1, 2024 Order, ECF No. [178], required Plaintiff to respond to the MSJ specifically directing that Plaintiff comply with Federal Rule of Civil Procedure 56.  *Id.* at 1.  The Order also advised Plaintiff that he "cannot rely solely on his complaint and other initial pleadings, but must respond with affidavits, depositions, or otherwise, to show that there are material issues of fact which require a trial." *Id.* at 2.  It is well settled that a *pro se* litigant is responsible for following court orders.  *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989).  Plaintiff's Response to the MSJ does not comply with the Court's Order, ECF No. [178], Fed. R.

---

[2] In his Appendix, ECF No. [202], however, Plaintiff has provided a Sworn Declaration ("Affidavit"), properly executed pursuant to 28 U.S.C. § 1746.  *See Id.*, Ex. 3 at 4–7.  Thus, the Affidavit is properly before the Court for consideration.

Civ. P. 56, and S.D. Loc. R. 56.1, resulting in "the functional analog of an unopposed motion for summary judgment." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (citing *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008)). Neither Plaintiff's Response to the MSJ nor his Statement of Material Facts have an affirmation by Petitioner in compliance with 28 U.S.C. § 1746.[3] Accordingly, where, as here, Defendants' Statement of Material Facts is deemed admitted, the Court "must still review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact. *Mann*, 58 F.3d at 1303 (citing *Reese*, 527 F.3d at 1269). "Even in an unopposed motion, the movant party still bears the burden of identifying, 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 1303 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

---

[3] Title 28 U.S.C. § 1746 provides that when "any matter is required or permitted to be supported . . . or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same . . . such matter may, with like force and effect, be supported, evidenced, established or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated in substantially the following form:

\* \* \*

(2) If executed within the United States, its territories, possession or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Signature)".

28 U.S.C. § 1746(2).

B.     *Statement of Undisputed Material Facts*

Defendants have submitted a Statement of Undisputed Material Facts ("Defendants' Statement") with supporting exhibits.  ECF No. [175].  In response, Plaintiff has filed an unsworn Statement of Material Facts in Dispute ("Plaintiff's Statement"),  ECF No. [209], in addition to his own Affidavit, ECF No. [202], Ex. 1 at 4–9, attached as an exhibit to his Appendix, ECF No. [202], in support of his Response in Opposition to Defendants MSJ, ECF No. [201].  The undisputed facts presented here are based on these filings, as well as the Court's review of the surveillance footage, ECF No. [181].

On October 19, 2020, the night before the  incident, Plaintiff had stayed awake arguing with his girlfriend about his involvement in Nicolas Segrera's ("Segrera") drug selling operation. ECF No. [175] at 3 ¶ 10 (citing Plaintiff's Depo., ECF No. [175-3], Ex. 3 at 112–13).  At the time, Plaintiff was living in an apartment complex in Miami, Florida (the "Apartment") with Segrera, a suspected drug trafficker.  ECF No. [200] at 5 ¶ 16; *see also* ECF No. [175] at 3 ¶ 7 (citing Plaintiff's Depo., ECF No. [175-3], Ex. 3 at 7); *see also* Plaintiff's Aff., ECF No. [202], Ex. 1 at 4 ¶ 4.  While there, Plaintiff assisted Segrera by delivering drugs and was paid between $300 to $500 for each delivery.  ECF No. [209] at 5 ¶ 16; *see also* ECF No. [175] at 3 ¶ 8 (citing Plaintiff's Depo., ECF No. [175-3], Ex. 3 at 58).

On October 20, 2020, after concluding an operational meeting at an undisclosed location, Rodriguez, part of the MDPD Narcotics Bureau, sat in his unmarked police vehicle across the street from the apartment complex where Segrera

resided, taking investigative notes and preparing a draft warrant to search the Apartment. ECF No. [175] at 2 ¶ 2 (citing Rodriguez Affidavit ("Aff."), ECF No. [1751] at 2 ¶ 11).

At approximately 6:00 a.m. or 7:00 a.m. on that day, Plaintiff fell asleep for a total of three to four hours, waking up around 9:30 a.m. or 10:00 a.m. *Id.* at 3 ¶ 11 (citing Plaintiff's Depo., ECF No. [175-3], Ex. 3, Ex. 3 at 113). Immediately after waking up, Plaintiff admits he smoked some "weed." *Id.* at 3 ¶ 12 (citing Plaintiff's Depo., ECF No. [175-3], Ex. 3, Ex. 3 at 47). Later that day, Plaintiff states he smoked more weed with his friend Rahme, twice as much weed as he normally would on any given day. *Id.* at 3 ¶¶ 13–14 (citing Plaintiff's Depo., ECF No. [175-3], Ex. 3, Ex. 3 at 45–47, 113–15).

On that day, an undercover agent ("UA") for the Drug Enforcement Administration ("DEA") working with Rodriguez arranged to purchase drugs from Segrera at the parking garage of the Apartment. ECF No. [175] at 2 ¶ 1 (citing Rodriguez Aff. ECF No. [175-1], Ex. 1 at ¶¶ 4, 8). This transaction was completed at approximately 6:41 p.m. ECF No. [175] at 2 ¶ 3 (citing Reyes Aff. ECF No. [175-2] at 1 ¶ 6).

After Segrera exchanged narcotics for money, Defendants Reyes, Waddell, Love, Martinez, and Fernandez, along with Detective Xavier Alvarez ("Alvarez")[4]

---

[4] Alvarez was not a named as a defendant in the operative Third Amended Complaint. *See* ECF No. [96] at 1–7.

(jointly, the PR Officers") were part of the "Priority Response Team" ("PR Team")[5]—the team of officials first on the scene who responded to the hallway outside the Apartment to "freeze" the apartment. "Freezing" the location is designed to prevent anyone from entering or attempting to exit the Apartment until a search warrant was authorized and executed. ECF No. [175] at 2 ¶¶ 3–5 (citing Reyes Aff., ECF No. [175-2] at 1–2 ¶¶ 6, 9; Rodriguez Aff., ECF No. [175-1] at 2 ¶ 13); *see also* Sierra Aff., ECF No. [175-11] at 1–2 ¶8). Freezing ensures the safety of the officers involved and prevents the destruction of evidence relating to the ongoing drug trafficking that the officers believed was occurring inside the Apartment. ECF No. [175] at 3 ¶ 6 (citing Reyes Aff., ECF No. [175-2] ¶ 9).

While outside the Apartment, Reyes put his ear to the Apartment's door and heard someone inside say they were leaving. *Id.* at 4 ¶ 23 (citing Reyes Aff., ECF No. [1752] at 2 ¶¶ 10–11). As Michael Garcia ("Michael G.") opened the Apartment door, the PR Officers identified themselves, "screaming 'Police' repeatedly." Waddell Aff., ECF No. [175-8], Ex. 9 at 2 ¶ 13. As soon as Michael G. left the Apartment, Reyes handed him off to Love, who directed Michael G. to the ground, handcuffed him, and remained with him outside the Apartment. *Id.* at 4–5 ¶ 25–26 (citing Reyes Aff., ECF No. [175-2], Ex. 2 at 2 ¶¶ 12–13; Love Aff., ECF No. [175-5], Ex. 6 at 1 ¶ 13; Video Surveillance Footage ("Video"), ECF No. 181, Ex. 4-D, at 45:15). As Ehab Rahme ("Rahme"), approached the open doorway he observed the PR Officers and

---

[5] Plaintiff became aware of the identity of the PR Officers from his lawyer after he was incarcerated. *Id.* at 10 ¶ 75 (citing Plaintiff Depo., ECF No. [175-3], Ex. 3 at 119–20, 159).

immediately began retreating back inside the Apartment. *See* Reyes Aff., ECF No. [175-2] at 2 ¶¶ 14–15. Since the occupants of the Apartment were now alerted to the presence of the PR Officers and Rahme had stepped back into the Apartment, the PR Officers, with the exception of Love who had remained outside with Michael G., went inside "to detain Rahme and verify no one else was inside." *See* ECF No. [175] at 5 ¶ 29 (first citing Reyes Aff., ECF No. [175-2] at 2 ¶¶ 15, 16, and then citing Video, Ex. 4-D at 45:15). Rahme was apprehended still inside the doorway of the Apartment. ECF No. [175] at 5 ¶ 27 (citing Reyes Aff. ECF No. [1752], Ex. 2 at ¶ 14; Video ECF No. 4D at 45:16) *see also* ECF No. [209] at 1–2 ¶¶ 1–2. The Video confirms PR Officers Reyes, Martinez, Fernandez, Waddell, and Alvarez briefly entered the Apartment, and then exited shortly thereafter. *Id.* at 10 ¶ 83 (citing Love Aff., ECF No. [175-5] at 1 ¶ 16). At no point in the video footage are any of the Defendants Rodriguez, Reyes, Martinez, Fernandez, Waddell, Estevez, and Love, or Alvarez, seen entering the Apartment a second time. *Id.* at 10 ¶ 84 (citing Love Aff., ECF No. [175-5] at 1 ¶ 19).

At approximately 2:00 p.m., Plaintiff admits he drank a Percocet and some beers, laying on his bed, fully clothed, and fell asleep. *Id.* at 4 ¶¶ 7, 15–17 (citing Plaintiff's Depo., ECF No. [175-3], Ex. 3, Ex. 3 at 46–48, 115, 120–21). As he slept, Segrera called Plaintiff to deliver drugs, but Plaintiff did not answer the phone. *Id.* at 4 ¶ 21 (citing Plaintiff's Depo., ECF No. [175-3], Ex. 3, Ex. 3 at 61). While Plaintiff slept, Rahme remained in the Apartment. *Id.* at 4 ¶ 19 (citing Plaintiff's Depo., ECF No. [175-3], Ex. 3 at 117).

Because Plaintiff was asleep, he was unaware that there was a lot of ongoing activity in or about the Apartment. *Id.* at 4 ¶ 20 (citing Plaintiff's Depo., ECF No. [175-3], Ex. 3, Ex. 3 at 117). Specifically, Plaintiff states he was unaware of the earlier drug sale involving Segrera. *Id.* at 2 ¶¶ 3, 20 (citing Reyes Aff., ECF No. [175-2] at 1 ¶ 6; Plaintiff's Depo., ECF No. [1753] at 117, 127).

Later, Plaintiff was awakened and disoriented upon hearing Rahme scream. *Id.* at 5 ¶¶ 30–31 (citing Plaintiff's Depo., ECF No. [175-3], Ex. 3, Ex. 3 at 122–23); *see also* ECF No. [202] at 5 ¶ 7. Plaintiff states he jumped out of bed, peeked outside his bedroom door to see what was happening, but seeing no one, he retrieved and loaded a firearm that was underneath his bed. *Id.* at 5 ¶¶ 32–33 (citing Plaintiff's Depo., ECF No. [175-3], Ex. 3, Ex. 3 at 122, 124); *see also* ECF No. [202] at 5 ¶ 8. After retrieving the firearm, Plaintiff admits he walked towards the doorway of the Apartment, at which point he admits a bright light was shined in his eyes, while Plaintiff using both hands, pointed his firearm in the PR Officers' direction. ECF No. [201] at 5; *see also* ECF No. [175] at 5 ¶¶ 34–35 (citing Plaintiff's Depo., ECF No. [175-3], Ex. 3, Ex. 3 at 124, 128); *see also* ECF No. [202] at ¶ 9.

Eight seconds later, the first gunshot was heard. ECF No. [175] at 6 (citing Video, ECF No. [181] at 4D at 45:22–45:32). A bullet struck Fernandez's ear and grazed the back of his neck, after which both Martinez and Fernandez returned fire. *Id.* at 6 ¶ 39 (citing Fernandez Aff., ECF No. [175-6] at 2 ¶15); Martinez Aff., ECF No. [175-7] at 2–3 ¶¶ 19, 20). Bullets struck Plaintiff's leg, and after he ran out of ammunition, Plaintiff crawled back into his bedroom. *Id.* at 6 ¶ 41 (citing Plaintiff

Depo., ECF No. [175-3], Ex. 3, Ex. 3 at 8–9, 125. During the gunfire, Love, who had remained in the hallway securing Michael G., took cover by dropping to the ground. *Id.* at 5, 7 (citing Fernandez Aff., ECF No. [1756] at 2 ¶ 14; Love Aff., ECF No. [175-5] at 1 ¶ 14;).

Approximately twenty (20) seconds after entering the Apartment, the Video shows the remaining PR Officers exiting the Apartment. ECF No. [175] at 10 ¶ 83 (citing Love Aff. ECF No. [173-5], Ex. 5 at 1 ¶ 16). Then, Reyes, who was accompanied by Rahme, took cover behind a corner of the hallway. *Id.* at 10 ¶ 83 (citing Love Aff., ECF No. [175-5] at 1 ¶ 16). Waddell also took Michael G. to a position of cover behind the opposite corner of the hallway. *Id.* at 7 (citing Reyes Aff., ECF No. [175-2] at 3 ¶ 25; Waddell Aff., ECF No. [175-8] at 3 ¶ 19).

Martinez took Fernandez, who had been shot, to Jackson Memorial Hospital for treatment. ECF No. [175] at 6 ¶¶ 43–46 (citing Fernandez Aff., ECF No. [1756] at 2 ¶¶ 17, 20, 23; Martinez Aff., ECF No. [175-7], Ex. 8 at 3 ¶¶ 23, 25; Reyes Aff., ECF No. [175-2], Ex. 2 at 3 ¶¶20, 23; Video, ECF No. [181], Ex. 4-D at 45:29, 45:33, 45:38, 45:45–45:48). After orders were given to begin evacuating the fifth-floor apartments, some PR Officers remained in the hallway waiting for a responding unit to take over. *Id.* at 7 ¶ 51 (citing Reyes Aff., ECF No. [175-2] at 3 ¶ 27). Plaintiff had no knowledge of what these PR Officers did or where they went after they exited the Apartment the first time. *Id.* at 8 ¶ 57 (citing Plaintiff Depo., ECF No. [175-3], Ex. 3, Ex. 3 at 151–52.

Plaintiff claims that, after the PR Officers first exited the Apartment, he sat on the floor, pointing the loaded gun at the bedroom door until he passed out for approximately two hours. *Id.* at 8 ¶ 58 (citing Plaintiff Depo., ECF No. [175-3], Ex. 3, Ex. 3 at 148–49, 152). At 6:52 p.m., Plaintiff called 911 to report that he had been shot. *Id.* at 7 ¶ 49 (citing Plaintiff Depo., ECF No. [175-3], Ex. 3 at 148; 911 Transcript, ECF No. [175-9] at 2). At 9:03 p.m., when no medical assistance had arrived, Plaintiff called 911 a second time. *Id.* at 9 ¶ 65 (citing Plaintiff Depo., ECF No. [175-3], Ex. 3 at 149; 911 Transcript, ECF No. [175-12]).

Sometime after the PR Officers exited the Apartment the first time, the Special Response Officers ("SR Officers")[6] arrived and relieved the PR Officers, assuming control of the scene by "[h]olding point outside" of the Apartment. *Id.* at 7 ¶¶ 52, 55 (citing Diaz Aff., ECF No. [175-10] at 1–2 ¶¶ 9–12); *Id.* at 8 ¶ 62; *Id.* at 8 ¶ 62 (citing Video, ECF No. [181], Ex. 4-D at 1:21:28; Sierra Aff., ECF No. [175-11] at 2 ¶ 10).

At approximately 8:50 p.m., a member of the PR Team flew an aerial drone outside the Apartment in an effort to ascertain Plaintiff's location inside. *Id.* at 9 ¶ 63 (citing Diaz Aff., ECF No. [175-10] at 2 ¶ 15). Later, SR Officers, wearing tactical

---

[6] SR Officers are part of a specialized Special Response Team ("SR Team") are required to attend a three-week special training tactical school and complete a certification process in order to ensure the safety of the involved subjects, bystanders, and SR Officers. *Id.* at 8 ¶ 60–61 (citing Sierra Aff., ECF No. [17511] at 1 ¶¶ 3–4). The SR Officers provide tactical support in various high-risk law enforcement contexts, including high-risk search and arrest warrants. *Id.* at 8 ¶ 60 (citing Sierra Aff., ECF No. [175-11] at 1 ¶ 3). None of the PRT Narcotics Detectives are certified. *Id.* at 9 ¶ 70 (citing Rodriguez Aff., ECF No. [175-1] at 3 ¶ 20; Reyes Aff., ECF No. [175-2] at 4 ¶ 32; Love Aff., ECF No. [175-5] at 1 ¶ 21; Fernandez Aff., ECF No. [175-6] at 3 ¶ 21; Martinez Aff., ECF No. [175-7] at 3 ¶ 28; Waddell Aff., ECF No. [175-8] at 3 ¶ 24; Estevez Aff., ECF No. [175-13] at 1 ¶ 11).

gear and helmets, entered the Apartment.  *Id.* at 9 ¶ 66 (citing Plaintiff Depo., ECF No. [175-3], Ex. 3 at 157–58; Video, ECF No. [181] at Ex. 4-D at 3:00:13).  Plaintiff states that one of the SR Officers grabbed his leg and pulled him away from where his firearm lay on the floor, while other officers began kicking, punching, and pistol-whipping Plaintiff in and about his face.  ECF No. [175] at 9 ¶¶ 71-72 (citing Plaintiff Depo., ECF No. [175-3], Ex. 3 at 161, 163).

Eventually, Plaintiff was taken out of the Apartment on a stretcher.  *Id.* at 9, 74 (citing Video, ECF No. [181], Ex. 4-D at 3:07:38).  Plaintiff states he cannot remember the incident well because it was "traumatic."  *Id.* at 10 ¶ 79 (citing Plaintiff Depo., ECF No. [175-3], Ex. 3 at 163).  Plaintiff could not recall who handcuffed him, nor could he recall receiving treatment before arriving at Jackson Memorial Hospital.  *Id.* at 10 ¶¶ 80–81 (citing Plaintiff Depo., [ECF No. 175-3], Ex. 3 at 169, 172).

C.    *Plaintiff's Response*

Plaintiff disputes the following. [7]  First, Plaintiff denies that his friend Rahme approached the front door.  ECF No. [209] at 1–2 ¶ 1–2 (citing Plaintiff Jan. 16, 2024 Depo., ECF No. [175-3], Ex. 3, Ex. 3 at 123 [T. 123]; ECF No. [175-8], Ex. 8 at 2 at

---

[7] In his Statement of Material Facts in Dispute, ECF No. [209], Plaintiff cites to exhibits, but did not attach any to his filing or as a separate appendix and it is not clear from the record whether he is relying on the exhibits attached to the Defendants' Statement of Undisputed Fact, ECF No. [175] or his own exhibits, ECF No. [202] filed in support of his Motion in Opposition to the MSJ, ECF No. [201].  To the extent the Court is able to ascertain what exhibit Plaintiff is relying on, it has done so in this Order.  Plaintiff, for example, has referenced an Ex. 4 at "106:1125, 107:46" but does not identify where this exhibit is located as it neither matches the exhibits filed by Defendants, ECF No. [175] nor Plaintiff's own exhibits filed in opposition to the Defendants' MSJ, ECF No. [202].

¶15; ECF No. [175-4]). Instead, Plaintiff argues that Rahme was one step behind Michael G. and was "attacked" by the PRO Officers, "forced backwards into the [A]partment by Reyes in an effort to create an exigent circumstance[,]" as the ensuing "take down" occurred while Rahme stood inside the doorway. *Id.*at 1–2 ¶¶ 2–3 (citing *Id.*).

Second, Plaintiff denies firing his weapon everywhere and argues he fired his weapon in response to being fired upon. *Id.* at 2 ¶ 4 (citing Plaintiff Depo., ECF No. [175-3], Ex. 3 at 129; *see also* Plaintiff Aff., ECF No. [202], Ex. 1 at 6 ¶ 11).

Third, Plaintiff denies that the PR Officers left the fifth floor of the Apartment and did not return until after Plaintiff was in custody and out of the Apartment, stating that Defendants, except for Rodriguez and Fernandez, were part of the SR Team who entered the Apartment and used excessive force after Plaintiff had surrendered, was unarmed, and incapacitated due to the bullet wounds to his leg. ECF No. [209] at 2 ¶ 6 (citing  Plaintiff Depo., ECF No. [175-3], Ex. 3 at 136–37, 145–47, 158, 166; Martinez Depo.,[8] ECF No. [202], Ex. 16 at 148).  Plaintiff also argues that Martinez returned to the Apartment a second time and was positively identified as one of the officers who beat Plaintiff until he lost consciousness. *Id.* at 2 ¶ 5 (citing Plaintiff Depo., ECF No. [175-3], Ex. 3 at 6–11, 137–38, 141 [T. 6–11, 137–38, 141];

---

[8] In his deposition, Martinez testified that he could not remember how events unfolded after Fernandez was shot, but thinks he went back to the scene, not to the Apartment building, and instead remained in the outside area where spoke to a Ms. Mena. *See* Martinez Depo., ECF No. [202], Ex. 16 at 47.

Martinez Depo., ECF No. [202], Ex. 16 at 148 [T. 46]; and Sierra Aff., ECF No. [202], Ex. 14 at 141, ¶ 9).

Plaintiff contends that his declaration during his deposition that he was "fucked up" and "out of it," when read in context, reveals that he was referring to how he felt following the "[s]evere beating" he received from the officers who entered the Apartment a second time.  *Id.* at 4–5 ¶ 13 (citing Plaintiff Depo. [175-3], Ex. 3 at 15–23).  Plaintiff argues that Estevez entered the Apartment as part of a team assigned to execute a search warrant, claiming Estevez was present when the Defendants entered the Apartment a second time on October 20, 2020 at 9:03 p.m.  *Id.* at 5 ¶ 15 (citing Plaintiff Depo., ECF No. [175-3], Ex. 3 at 175).

## II.   APPLIABLE LEGAL STANDARDS

### A.   *Civil Rights Standard of Review*

"To state a claim under 42 U.S.C. § 1983, a plaintiff must alleged:  (1) the defendant deprived him of a right secured by the United States Constitution or federal law and (2) such deprivation occurred under color of state law." *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010) (citations omitted).

### B.   *Summary Judgment Standard*

A motion for summary judgment looks to "pierce the pleadings and to assess the proof in order to see whether there is a *genuine need for trial.*"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, No. 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).  Thus, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Grayson v. Warden, Comm'r, Ala. Dep't of Corr.*, 869 F.3d 1204, 1220 (11th Cir. 2017) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also* Fed. R. Civ. P. 56(a).  When reviewing a motion for summary judgment, the Court must "view all the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Furcon v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016) (quoting *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011)).  Accordingly, the Court "'may not weigh conflicting evidence or make credibility determinations'" when reviewing a motion for summary judgment. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citing *FindWhat Inv. Grp.*, 658 F.3d at 1307).  Where the facts specifically averred by the non-moving party contradict facts specifically averred by the movant, the motion must be denied, assuming those facts involve a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Because summary judgment is warranted only if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law[,]" *Great Am. All. Ins. Co. v. Anderson*, 847 F.3d 1327, 1331 (11th 2017) (quoting Fed. R. Civ. P. 56(a)), the movant party necessarily carries the burden.

*Great Am. All. Ins. Co.*, 847 F.3d at 1331 (relying on *Celotex*, 477 U.S. at 323).   In

meeting that burden, the nonmoving parties may rely on materials enumerated in

Fed. R. Civ. P. 56(c) even though they would not be admissible at trial.  *Owen v. Wille*,

117 F.3d 1235, 1236 (11th Cir. 1997) (quoting *Celotex*, 477 U.S. at 324).

Issues are genuine if there is sufficient evidence for a reasonable jury to return

a verdict for either party.  *Great Am. All. Ins. Co.*, 847 F.3d at 1331 (relying upon

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Similarly, "an issue is

material if it may affect the outcome of the suit under governing law." *Great Am. All.*

*Ins. Co.*, 847 F.3d at 1331 (relying on *Anderson*, 477 U.S. at 248). "A mere scintilla

of evidence[,]" however, is insufficient "to create a genuine issue of material fact."

*See Hinson v.* Bias, 927 F.3d 1103, 1116 (11th Cir. 2019) (quoting *Anderson*, 477 U.S.

at 252).  Instead, "the nonmoving party must present enough evidence to allow a jury

to reasonably find in its favor."  *Hinson*, 927 F.3d at 1116.  In other words, the

evidence must be sufficient "to allow a jury to reasonably find in its favor." *Hinson*,

927 F.3d at 1116 (citing *Anderson*, 477 U.S. at 252).

When ruling on a motion for summary judgment, district courts must consider

any "specific facts" pled in the Plaintiff's sworn complaint, based on personal

knowledge, and executed under penalty of perjury, in opposition to summary

judgment; or, a sworn response to a summary judgment motion as "testimony." *See*

Fla. R. Civ. P. 56(e);  *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019) (first

citing *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (finding "our cases

correctly   explain   that   a   litigant's   self-serving   statements   based   on   personal

knowledge or observation can defeat summary judgment") and then citing *Barker v. Norman*, 651 F.2d 1107, 1115 (5th Cir. Unit A 1981) (stating that a verified complaint serves as the equivalent of an affidavit for purposes of summary judgment)). No separate affidavit needs to be filed by the *pro se* prisoner where the facts alleged in an inmate's sworn complaint are not conclusory in nature. *Sammons v. Taylor*, 967 F.2d 1533 n.5 (11th Cir. 1992) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). Unsworn statements, however, may not be considered when evaluating a summary judgment motion. *Sharma v. Johnston*, No. 11-10488, 515 F. App'x 818, 819 (11th Cir. Apr. 4, 2013) (citing *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003)). Further, where a plaintiff submits only "conclusory allegation[s], unsupported by any physical evidence, medical records, or corroborating testimony of witnesses . . . [courts] discount it[,]" as it is insufficient to defeat a motion for summary judgment. *Bennett v. Parker*, 898 F.2d 1530, 1533–34 (11th Cir. 1990). However, "[a]s a general principle, a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature." *Sears*, 922 F.3d at 1208 (11th Cir. 2019) (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013)). Thus, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

## III.  DISCUSSION

This case now concerns two issues.  First, whether Defendant Fernandez's initial warrantless entry into the Apartment on October 20, 2020 violated the Fourth Amendment right to be free from reasonable searches and seizures.  Second, whether Defendants Rodriguez, Martinez, Fernandez, Waddell, Esteves, Reyes, and Love used excessive force during either of two separate entries into the Apartment.

### A.    *Fourth Amendment Claim*

In the Third Amended Complaint, Plaintiff alleged that Defendants lacked probable cause to enter the Apartment.  However, Plaintiff only provided the name of one officer who entered the Apartment in the initial encounter, to-wit, Defendant Fernandez.  As a result, the Court entered an Order allowing the Third Amended Complaint to proceed on a Fourth Amendment unreasonable search and seizure claim solely against Fernandez arising from the warrantless initial entry into the Apartment where Plaintiff was residing.  ECF No. 95 at 4–5.  In its MSJ, Fernandez argues that the Fourth Amendment claim should be dismissed. ECF No. [176] at 6, n.4. [9]   In his unsworn Motion in Opposition, Plaintiff argues that Defendants

---

[9] The Court recognizes that a § 1983 claim for damages relating to a conviction that has not been invalidated is not cognizable in a § 1983 suit.  *See Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994).  However, not all claims based on an unlawful search and seizure of property are *Heck*-barred.  *See Hughes v. Lott*, 350 F.3d 1157, 1160 (11th Cir. 2003) (finding that, "[b]ecause an illegal search and seizure may be followed by a valid conviction, . . . a successful § 1983 action for Fourth Amendment search and seizure violations does not necessarily imply the invalidity of a conviction").  Here, there is insufficient record evidence for the Court to determine whether Plaintiff's Fourth Amendment claim is *Heck*-barred.  Indeed, the record does not contain the warrant that was eventually secured to enter the premises nor is the

warrantless entry violated his Fourth Amendment rights because there were no exigent circumstances justifying the warrantless entry into the Apartment. ECF No. [201] at 10. For the reasons discussed below, the Court finds Fernandez is entitled to judgment as a matter of law on his Fourth Amendment claim.

Relevant to Plaintiff's Fourth Amendment claim, it is undisputed that Fernandez did not have a warrant to enter or search the Apartment. Thus, the Court must determine whether Fernandez had probable cause to enter and search the Apartment and whether exigent circumstances justified the warrantless entry. The Fourth Amendment "[s]ecures 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ..'" U.S. Const. amend. IV)). "The 'chief evil' against which the Fourth Amendment is directed is a government agent's warrantless entry into a person's home." *Feliciano*, 707 F.3d at 1250 (11th Cir. 2013) (quoting *Payton v. New York*, 445 U.S. 573, 585 (1980). "A warrantless and nonconsensual entry into a person's home, and any resulting search or seizure, violates the Fourth Amendment unless it is supported by both probable cause and exigent circumstances." *Feliciano*, 707 F.3d at 1250 (citations omitted); *see also Kirk v. Louisiana*, 536 U.S. 635, 638 (2002).

"Probable cause to search requires a 'fair probability that contraband or evidence of a crime will be found in a particular case[.]" *Feliciano*, 707 F.2d at 1251 (citing *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991)). "Exigent

---

Court able to ascertain whether the narcotics that Plaintiff pled to possessing were seized as part of the warrantless entry into the apartment.

circumstances, in turn, arise when 'the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action.'" *Feliciano*, 707 F.2d at 1251 (quoting *United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1983)); *see also McClish v. Nugent*, 483 F.3d 1231, 1240 (11th Cir. 2007).

The Eleventh Circuit has made clear that "the need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be so quickly destroyed." *United States v. Tobin*, 923 F.2d 1506, 1510 (quoting *United States v. Young*, 909 F.2d 442, 446 (11th Cir. 1990)). The test for exigent circumstances is an objective one. *United States v. Young*, 909 F.2d at 446. "[T]he appropriate inquiry is whether the facts . . . would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured." *Id.*; *see also Feliciano*, 707 F.2d at 1251 (quoting *Burgos*, 720 F.2d at 1510); *see also Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978).

Further, "a 'protective sweep' is an independent justification for a warrantless entry." *United States v. Flores*, 380 F. App'x 921, 924 (11th Cir. 2010) (citing *United States v. Burgos*, 720 F.2d 1520, 1525–26 (11th Cir. 1983)); *see also United States v. Timmann*, 741 F.3d 1170, 1181 (11th Cir. 2013) ("A protective sweep may be undertaken without an arrest warrant, so long as the officers are lawfully within the premises due to, for example, the existence of exigent circumstances."). The sweep must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *United States v. Delancy*, 502 F.3d 1297, 1306 (11th Cir. 2007).

The undisputed facts demonstrate that Fernandez's initial entry into the Apartment was reasonable and more of a warrantless protective sweep of the premises than a search.  Indeed, the record evidence confirms that, on October 20, 2020, an UA purchased narcotics from suspected drug trafficker Segrera in the garage of Apartment complex where Segrera lived and where officers suspected drugs were being sold.  ECF No. [175-1] at 2 ¶ 1 (citing Rodriguez Aff., ECF No. [175-1] at 1 ¶¶ 4, 8).  Plaintiff, who was living in the Apartment at time was paid to assist Segrera with the delivery of drugs.  ECF No. [175] at 3 ¶¶ 7–8 (citing Plaintiff's Depo., ECF No. [175-3], Ex. 3 at 57–58).  After the drug sale to Segrera was completed, the PR Officers Reyes, Waddell, Martinez, Fernandez, Love and Alvarez responded to the hallway outside the Apartment in order to prevent anyone from entering or attempting to exit the Apartment before a warrant was issued.  ECF No. [175] at 2 ¶¶ 3–5 (citing Reyes Aff., ECF No. [175-2] ¶¶ 6, 9; Rodriguez Aff., ECF No. [175-1] ¶ 13).  As Michael G. exited the Apartment, PR Officers screamed "Police," apprehended the suspect, and handed-him off to Love.  ECF No. 175 at 4 ¶ 25 (citing Love Aff., ECF No. [175-5] at 1 ¶ 13; *see also* Video, ECF No. [181], Ex. 4-D at 45:12– 45:15).  Rahme, steps behind Michael G., was approaching the doorway but then immediately retreated backwards upon seeing the PR Officers.  ECF No. [175] at 5 ¶ 27 (citing Reyes Aff., ECF No. [175-2], Ex. 2 at ¶ 14).  Believing that any remaining occupants of the Apartment were now alerted to the presence of law enforcement, the PR Officers, with the exception of Love, who remained outside with Michael G., entered the threshold of the Apartment to detain Rahme and then entered to verify

that there were no other occupants. *Id.* at 5, ¶¶ 27-29 (citing Reyes Aff., ECF No. [175-2] at 2 ¶¶ 14–16; *see also* ECF No. [181], Ex. 4-D at 45:16; ECF No. [209] at 1–2 ¶¶ 1–3).

On this evidence, it was reasonable for Fernandez to enter the Apartment, secure Rahme in the doorway, and conduct a protective sweep to ensure that no other occupants could pose a danger to the PR Officers or other occupants of the Apartment. *See United States v. Tobin,* 923 F.2d 1506, 1513 (11th Cir. 1991) (concluding that a protective sweep of the home was proper even when the defendant had been arrested in the garage). Even when considering the facts in the light most favorable to the Plaintiff, Fernandez, who first entered the Apartment without a warrant, was justified in entering and conducting a protective sweep of the premises to protect the safety of the officers and others. Therefore, Fernandez is entitled to summary judgment in his favor on the Fourth Amendment warrantless entry into the Apartment.

## B. *Excessive Use of Force Claims*

As an initial matter, in their MSJ, Defendants argue that Plaintiff's Response, ECF No. [201], to the MSJ should not be considered by the Court because Plaintiff "'[h]as failed to comply with Local Rule 56.1" arguing Plaintiff failed to dispute Defendants facts with specific citations to the record. ECF No. [204] at 3. After careful review of Plaintiff's Statement of Disputed Facts, the Court finds Plaintiff sufficiently cited to portions of the record, including his own sworn declaration and

deposition testimony, disputing Defendants' facts. The Court, therefore, declines to disregard Plaintiff's Statement of Disputed Facts.

On the substance, Defendants argue they are entitled to qualified immunity because there is no evidence of a constitutional violation. *Id.* Regarding the first entry into the Apartment, Fernandez and the other PR Officers maintain that the use of force was reasonable under the circumstances. Regarding the second entry into the Apartment, Defendants argue they never re-entered the Apartment a second time after the shooting. *See* ECF No. [176] at 8. Further, Defendants argue that Estevez was on another assignment on October 20, 2020 and was not present during the two entries into the Apartment that day. ECF No. [176] at 5 n.3 (citing Alexander Estevez Declaration ECF No. [17-13] at 1 ¶¶ 9–10).

To establish they are entitled to qualified immunity, Defendants must demonstrate that they were acting within the scope of their discretionary authority at the time of the alleged constitutional violation. *See Paez v. Mulvey*, 915 F.3d 1276, 1284 (11th Cir. 2019). There is no dispute that Defendants were acting within the scope of their discretionary authority at the time of the alleged constitutional violation.

Because this showing is made, the burden shifts to Plaintiff to establish that: (1) a constitutional right was violated by the officers; and (2) the right was clearly established at the time of the violation. [10] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735

---

[10] To demonstrate that a right is "clearly established," "[t]he plaintiff can point to a materially similar case decided at the time of the relevant conduct by the Supreme Court, the Eleventh Circuit, or the relevant state supreme court. . . . The prior case

(2011); *see also Roberts v. Spielman*, 643 F.3d 899, 904 (11th Cir. 2011). The constitutional right must be sufficiently clear for a reasonable official to understand that what he is doing violates that right. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *see also Vinyard v. Wilson*, 311 F.3d 1340, 1353 (11th Cir. 2002) (citations omitted).

"In an excessive force case arising out of an arrest," as is the case here, "whether a constitutional violation occurred is governed by the Fourth's Amendment's 'objective reasonableness' standard." *Hadley*, 526 F.3d at 1329 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (first citing *Tennessee v. Garner,* 471 U.S. 1, (1985) and then citing *Graham v. Connor*, 490 U.S. 386 (1989))). "A genuine 'excessive force' claim relates to the manner in which an arrest was carried out, independent of whether law enforcement had the power to arrest." *Hadley*, 526 F.3d at 1329 (quoting *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1332 (11th Cir. 2006)).

The test for determining whether the use of force was reasonable is an objective one, which requires "that a pretrial detainee . . . show only that the force purposefully or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 395 (2015). In this regard, the officer "must possess a

---

law need not be directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. Second, the plaintiff can identify a broader, clearly established principle that should govern the novel facts of the situation. Third, the plaintiff can show that the conduct at issue so obviously violated the Constitution that prior case law is unnecessary." *Patel*, 969 F.3d at 1186 (quoting *J W ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259–60 (11th Cir. 2018)).

purposeful, a knowing, or possibly a reckless state of mind" because "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." *Kingsley*, 576 U.S. at 396 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) (emphasis in original)). "Objective reasonableness turns on the 'facts and circumstances of each particular case." *Kingsley*, 576 U.S. at 395 (quoting *Graham*, 490 U.S. at 396).

The reasonableness of the force used must be determined "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397 (citing *Graham*, 490 U.S. at 396). In this regard, courts should consider "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; . . . the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397 (citing *Graham*, 490 U.S. at 396). "It is reasonable for police to move quickly if delay 'would greatly endanger their lives or the lives of others.' This is true even when, judged with the benefit of hindsight, the officers may have made 'some mistakes.'" *City and Cnty. of San Francisco, Cal. v. Sheehan*, 575 U.S. 600, 612 (2015) (first quoting *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298-99 (1967) and then quoting *Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014) ("To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.')). "The Constitution

is not blind to 'the fact that police officers are often forced to make split-second judgments." *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014)).

The law is clearly established that "[a]n officer may only use deadly force against a person whom the officer reasonably perceives as imposing an imminent threat of serious physical harm to the officer or others." *Gregory v. Miami-Dade Cnty.*, 719 F. App'x 859, 866 (11th Cir. 2017). An officer who uses deadly force against a person who is reasonably believed to pose an imminent threat of serious physical harm to the officer or others is entitled to qualify immunity even if 20/20 hindsight shows that the officer was mistaken. *See e.g., Varnadore v. Merritt*, 778 F. App'x 808, 813 (11th Cir. 2019); *Penley v. Eslinger*, 605 F.3d 843, 854 (11th Cir. 2010). However, if the officer's belief about the threat is posed by the suspect unreasonable, then the officer is not entitled to qualified immunity or his use of deadly force. *See e.g., Clawson v. Rigney*, 777 F. App'x 381, 387 (11th Cir. 2019); *Mighty v. Miami-Dade Cnty.*, 659 F. App'x 969, 973 (11th Cir. 20160); *Perez v. Suszczynski*, 809 F.3d 1213, 1220–21 (11th Cir. 2016); *Salvato v. Miley*, 790 F.3d 1286, 1294 (11th Cir. 2015); *Morton v. Kirkwood*, 707 F.3d 1276, 1282 (11th Cir. 2013).

The Court now turns to whether there was use of excess force, either during the first entry or the second entry into the Apartment.

### 1. First Entry into the Apartment

In the Third Amended Complaint, Plaintiff claims that PR Officers Rodriguez, Fernandez, Martinez, Waddell, Estevez, Reyes, and Love initially entered the Apartment and began shooting at him. ECF No. [85]. Plaintiff denies shooting first

at the PR Officers and instead, claims Defendants fired the first shot in an effort to "murder" him, and only then did he return fire. ECF No. [85] at 6 ¶ 8.

In the MSJ, Defendants argue that the use of force by Fernandez and Martinez, the only ones who fired their weapons at Plaintiff, was an objectively reasonable response since Plaintiff was firing at them and the other PR Officers who first entered the Apartment. ECF No. [176] at 4 *Id.* Defendants further argue that, with the exception of Fernandez and Martinez, none of the remaining Defendants who initially entered the Apartment used deadly force and, therefore, all Defendants are entitled to qualified immunity. ECF No. [176] at 10–11. Finally, Defendants argue that Rodriguez was not present when the other PR Officers initially entered the Apartment. *Id.*

In Opposition to the MSJ, Plaintiff reiterates that when the PR Officers who first entered the Apartment observed Plaintiff holding a firearm, they "opened fire" while shining a bright light in Plaintiff's eyes.[11] ECF No. [201] at 14. Plaintiff maintains that the issue of who fired first is "immaterial" to whether the Defendants are entitled to judgment as a matter of law. *Id.* at 14, n.4. Plaintiff admits he "[r]eturned fire, apparently striking one of the officers in the ear." *Id.* at 15. The Court will now review Defendants' conduct.

---

[11] At the time, Plaintiff mistakenly believed the Narcotics Detectives who initially entered the unit were actually home invasion robbers. ECF No. [201] at 14.

a.    *Defendants Rodriguez, Love, and Estevez*

The undisputed record evidence confirms Defendant Rodriguez was not in the Apartment at the time the other offices entered as he was in the process of drafting a search warrant following the narcotics transaction with Segrera, and, therefore, did not accompany the other PR Officers when they first entered the Apartment.

Next, Plaintiff concedes that Love remained outside the Apartment when other PR Officers initially entered the Apartment as he was securing Michael G. who had previously exited the Apartment.  ECF No. [175] at 4 ¶ 25.  Love then directed M. Garcia to the ground and handcuffed him.  *Id.* at 5 ¶ 26.  While outside the Apartment with Michael G., Love heard gunfire and responded by placing his hand on the wall and dropping to the ground.  *Id.* at 5 ¶¶ 28, 37.  Thus, there is no dispute that Love did not initially enter the Apartment with the other PRT Narcotics Officers at the time shots were fired by Martinez and Fernandez.

As to Estevez, it is undisputed that Estevez was not present during the initial entry into the Apartment when gunfire erupted.  ECF No. [175] at 11 ¶¶ 86–87; *see also* ECF No. [209] at 6 ¶ 28.  At the time of the initial entry and resulting gunfire, Estevez was at Kendall Regional Hospital, involved in a narcotics sale to another suspected drug trafficker.  *Id.* at 11 ¶87.  While at the hospital, Estevez received that the news that there was a police-involved shooting at the Apartment.  *Id.* at 11 ¶ 87.

Given the foregoing undisputed facts, the evidence supports a finding that these Defendants—Rodriguez, Love, and Estevez—were not present at the time the initial entry into the Apartment occurred.  Accordingly, summary judgment as a

matter of law is warranted as to Rodriguez, Love, and Estevez arising from Plaintiff's claim of unlawful use of force during the first entry into the Apartment.

b.      *Defendants Reyes, Martinez, Fernandez, and Waddell*

The remaining PR Officers Reyes, Martinez, Fernandez, and Waddell argue they are also entitled to summary judgment as a matter of law because the force used by Defendants Martinez and Fernandez in response to Plaintiff's firing shots at them was reasonable under the circumstances. *See Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013) ("In excessive force cases, [courts are to be] mindful that officers make split-second decisions in tough and tense situations."). The Court agrees.

First, the undisputed facts establish that there were at least four officers, one of which was arguably wearing plain clothes, who entered the Apartment on October 20, 2020. [12] *See* DE 181, Ex. 4-D at 43:24 to 43:42;[13] *see also* Plaintiff's Depo., ECF No. [175-3], Ex. 3 at 124.  ). After Michael G. exited the Apartment and Rahme attempted to do so, the remaining PR Officers, Reyes, Martinez, Fernandez, and Waddell believing that any other possible occupants of the Apartment were now

---

[12] In addition to the officers who first entered, another officer, Xavier Alvarez, also responded accompanying Reyes, Martinez, Fernandez, and Waddell as they initially entered the Apartment.  However, Alvarez was not sued in this case.  Even if he were a party to this action, the Court finds he too is entitled to judgment as a matter of law for the reasons discussed in this Order.

[13] The Court has reviewed all of the video surveillance provided, ECF No. [181], and compared the various exhibits with composite exhibit 4-D and find that the recordings therein are corroborated by the other exhibits provided.  Plaintiff "[c]oncedes that video evidence is authentic" to the extent Javier Giovane "[d]eclares that it shows what it shows." ECF No. [211] at 7.  For judicial convenience, the Court is citing to compositive exhibit 4-D when referencing the Video.

alerted to the presence of law enforcement, entered the Apartment to detain Rahme and to verify that there were no other occupants. *Id.* at 5, ¶¶ 27-29 (citing Reyes Aff., ECF No. [175-2] at 2 ¶¶ 14–16; *see also* ECF No. [181], Ex. 4-D at 45:16; ECF No. [209] at 1–2 ¶¶ 1–3). Because at least two individuals were attempting to leave the apartment after being alerted that law enforcement was in the hallway, the warrantless entry into the Apartment by Fernandez and the other PR Officers was lawful as there was a risk that others inside were attempting to leave and possibly remove evidence from inside the Apartment. It is further undisputed that only two officers, Defendants Fernandez and Martinez, fired towards Plaintiff's during the initial entry into the Apartment. ECF No. [175] at 6 ¶ 40; *see also* ECF No. [209] at 5 ¶19.

Indeed, the record evidence, including the Video recordings, confirm that after the gunfire between Plaintiff, and Defendants Fernandez and Martinez, Defendants—Waddell and Reyes—retreated towards the front of the Apartment. *See* ECF No. [175] at 6–7 ¶¶ 42, 48, 51 (citing Reyes Aff., ECF No. [175-2] at 3 ¶¶ 25–26; Fernandez Aff., ECF No. [175-6] at 2 ¶ 14; Waddell Aff., ECF No. [175-8] at 3 ¶ 19; and Love Aff., ECF No. [175-5] at 1 ¶ 14;). Because there is no record evidence that as to any unlawful use of force by Reyes and Waddell the excessive use of force as to these two defendants fails.

As such, the Court focuses on whether Fernandez and Martinez used excessive force when they discharged their weapons. Plaintiff disagrees that the use of force by Fernandez and Martinez was reasonable under the circumstances, providing

contradictory testimony regarding whether he was the initial shooter, or whether Fernandez and Martinez were the initial shooters. For example, in his sworn deposition testimony, Plaintiff concedes that when the officers initially entered the Apartment, he was blinded by their flashlights and "[j]ust started blind[ly] firing everywhere" in an effort "[t]o get them to leave and run out." Plaintiff's Depo., ECF No. [175-3], Ex. 3 at 124. In his sworn Affidavit, Plaintiff states that only after he was shot several times in the leg did he indiscriminately return fire. ECF No. [202], Ex. 1 at 5–6 ¶¶ 10–11.

The Court finds the use of deadly force at the time was reasonable under the circumstances even if Plaintiff was not the first to discharge his weapon. *Powell v. Snook*, 25 F.4th 912, 924 (11th Cir. 2022) (officer Snook was authorized to use deadly force after Powell raised and fire his gun); *see also Penley v. Eslinger*, 605 F.3d 843, 854 (11th Cir. 2010) (deadly force was a reasonable response to a student pointing what later ended up being a toy gun at officers). It is not disputed that Plaintiff was armed and was clearly brandishing, if not firing, his weapon. Indeed, Defendant Fernandez was shot during the exchange with Plaintiff. As such, it was reasonable for Martinez and Fernandez to use deadly force because the use of such force was necessary to dispel a threat of serious physical harm to the PR Officers who entered the Apartment or to others inside the Apartment. *See Malley v. Briggs*, 475 U.S. 335, 344–45 (1986) (finding conduct that is objectively unreasonable under the Fourth Amendment may still objectively reasonable for purposes of qualified immunity). Given the fluid nature of the circumstances as it evolved during the initial entry into

the Apartment, the use of force by Martinez and Fernandez was reasonable given that Plaintiff was armed and prepared to use a weapon against the officers.

Accordingly, the Court finds the Martinez and Fernandez are also entitled to summary judgment as a matter of law because their use of force during the first entry into the Apartment was reasonable under the circumstances, and there is no evidence to support a finding that Reyes and Waddell used any force during the entry. Because the Court finds no Eighth Amendment violation by these Defendants arising from the initial entry into the Apartment, Defendants are entitled to qualified immunity.

### 2. Second Entry into the Apartment

In the Third Amended Complaint, Plaintiff alleged that the Defendants—PR Officers Rodriguez, Fernandez, Martinez, Waddell, Estevez, Reyes, and Love— entered the Apartment a second time beating him unconscious. ECF Nos. [84], [96]. In the MSJ, the Defendants argue they are entitled to summary judgment because they never entered the Apartment a second time on October 20, 2020, and other officers—SR Officers—are the ones who entered the Apartment a second time to secure the Plaintiff. ECF No. [176] at 13, n.8. According to Defendants, at the time of the second entry, each was "[i]n another location, some relieved by other responding officers, two at the hospital, one downstairs preparing a search warrant and the other conducting an undercover operation in a separate case." *Id.* at 13, n.9. Also, Defendants argue that, once the SR Officers arrived, the PR Officers vacated the fifth floor of the Apartment complex and never returned there until after Plaintiff was removed from the Apartment and in custody. ECF No. [175] at 8 ¶ 56 (citing

Page 33 of 41

Reyes Aff., ECF No. [175-2], Ex. 2 at 4 ¶ 31; Love Aff., ECF No. [1755], Ex. 6 at 1 ¶ 20; Fernandez Aff., ECF No. [175-6], Ex. 7 at 3 ¶ 20; Martinez Aff.,[14] ECF No. [175-7], Ex. 8 at 3 ¶ 27; Waddell Aff., ECF No. [175-8], Ex. 9 at 3 ¶ 23). Defendants rely on their sworn affidavits and the Video to support their argument that they never entered a second time. *See* ECF No. [175]; Surveillance Footage ECF No. [181].

Plaintiff disagrees with Defendants assertion that they never entered the Apartment a second time. ECF No. [209] at 2–3 ¶ 6–7. Plaintiff, however, does not dispute that after he was shot, SR Officers arrived at the Apartment hallway and relieved the PR Officers, "holding point on the front door of the Apartment. ECF No. [175] at 7 ¶¶ 51-52, 55; *see also* ECF No. [209] at 5 ¶ 20. Plaintiff also agrees that the SR Officers wore "brown BDU-style pants, tan tactical shirts, black ballistic vests, and helmets" and are specially trained and equipped to provide a rapid response to incidents involving active shooters. ECF No. [175] at 7 ¶¶ 53–54; *see also* ECF No. [209] at 20. The Video confirms that the PR Officers did not wear helmets or other tactical gear at the time they initially entered the Apartment. *See* Video, ECF No. [181], Ex. 4-D at 43:31 to 45:34.

Nonetheless, Plaintiff insists that Martinez "was positively identified" as part of the SR Team who re-entered the Apartment and beat him unconscious. ECF No. [209] at 2 ¶ 5. Plaintiff relies on his own deposition testimony to establish that

---

[14] In fact, Waddell states after he was relieved by the SR Officers, he assisted Miami-Dade Fire Rescue with disarming the fire alarm that had gone off during the shooting and did not return to the Apartment a second time until a search warrant was executed the following day. Waddell Aff., ECF No. [175-8] at 3 ¶¶ 22–23.

all the Defendants "were clearly identified as part of a team that returned to [the Apartment] to use excessive force against Plaintiff after Plaintiff had surrendered and was unarmed and incapacitated." ECF No. [209] at 2 ¶ 6.  In the cited excerpts from his deposition, Plaintiff actually states he saw the Video only one time but insists "all the defendants are on the video footage" and show them entering the Apartment twice.  ECF No. [175-3], Ex. 3 at 136–37.  Notably, Plaintiff testified he could not describe the officers who entered the Apartment a second time because he had not "personally seen them" beat him but then equivocates stating he could identify them if they are presented in a lineup.  *Id.*  Plaintiff reiterated that Martinez was part of the group that was "beating his a--" because he could recall their voices and faces."  *Id.* at 141.  However, Plaintiff does not dispute that, after he shot Martinez during the initial entry into the Apartment, Martinez was taken to the hospital by Fernandez.

For the reasons specifically discussed below, the Defendants are entitled to judgment as a matter of law on the Plaintiff's Eighth Amendment claim arising from the second entry into the Apartment as there is no evidence on which a juror could reasonably conclude that any of these officers were part of the team that entered the Apartment a second time.

      a.   *Defendant Rodriguez*

It is undisputed that Rodriguez, was not present during the second entry because he was responding to the parking garage of the Apartment where he "secured evidence and stayed with Segrera, Rahme, and Michael Garcia" who had been

previously detained during the operation, until a marked unit arrived and took custody of them. Rodriguez Affidavit, ECF No. [175-1], Ex. 1 at 2 ¶ 15. Plaintiff's conclusory allegation that Rodriguez was one of the PR Officers who entered the Apartment a second time is refuted by the record evidence and Plaintiff's own admissions.[15] Because a reasonable jury could not plausibly infer that Rodriguez was even present during the second entry into the Apartment, he is entitled to summary judgment as a matter of law arising from Plaintiff's unlawful use of force claim arising during the second entry into the Apartment.

b.    *Fernandez and Martinez*

In the MSJ, Fernandez and Martinez argue they never returned to the Apartment a second time while Plaintiff was still inside. ECF No. [175] at 6 ¶ 47 (citing Fernandez Aff., ECF No. [175-6], Ex. 7 at 3 ¶20; Martinez Aff., ECF No. [1757], Ex. 8 at 3 ¶ 27). Plaintiff disagrees, insisting that Fernandez and Martinez were part of the group of SR Officers who entered the Apartment. ECF No. [209] at 2 ¶ 5.

As an initial matter, Plaintiff does not dispute that, after the PR Officers initially exited the Apartment, Martinez drove Fernandez to the hospital where he was treated for a gunshot wound to his ear and neck. *See* ECF No. [209] at 5 ¶ 19; *see also* ECF No. [175] at 6; Martinez Affidavit, ECF No. [1757], Ex. 8 at 3 ¶ 25; Fernandez Affidavit, ECF No. [175-6], Ex. 6 at 2 ¶18. Further as to Fernandez,

---

[15] Indeed, during his deposition, Plaintiff testified that he was actually considering dismissing Rodriguez as a party to the action because "he did not physically use force" but was "still trying to see if there's any way [he] could make [Rodriguez] liable." ECF No. [175-3], Ex. 3 at 196.

Plaintiff admits that after Fernandez exited the Apartment the first time, "he went to the hospital" and never returned to the Apartment "the second time." ECF No. [175-3], Ex. 3 at 152. Although he equivocates as to whether Fernandez was in any tactical gear, concedes Fernandez was not part of the group of officers who entered the Apartment and beat him unconscious. ECF No. [175-3], Ex. 3 at 137–38, 199.

As to Martinez, in his Affidavit, Martinez avers that he returned to the apartment complex hours later, but never to the fifth floor where the Apartment was located, only to hand in his firearm because it had been discharged in connection with a shooting. ECF No. [175-7], Ex. 8 at 3 ¶¶ 26–27. Plaintiff offers nothing more than bare conclusions that Martinez returned. The Video reveals that the second entry was done by SR Officers in tactical gear and not by the PR Officers. On this evidence, a reasonable jury could not find that Martinez and entered the Apartment a second time. Thus, Martinez is also entitled to judgment as a matter of law as to the unlawful use of force claim arising during the second entry into the Apartment.

        c.        *Defendants Love, Estevez, Reyes, and Waddell*

The remaining Defendants, Love, Estevez, Reyes, and Waddell, also argue they are entitled to judgment as matter of law because they also were not part of the team of SR Officers who re-entered the Apartment on the second occasion. ECF No. [175] at 7–8 ¶¶ 52–57. The Court finds that there is insufficient evidence to establish that these Defendants were even present, much less that they violated Plaintiff's constitutional rights.

Plaintiff does not dispute that the SR Officers responded to the scene wearing tactical uniforms, and the PR Officers were not wearing such gear. However, Plaintiff insists that the remaining Defendants Love, Esteves, Reyes, and Waddell re-entered the Apartment and beat him unconscious. ECF No. [209] at 2–3 ¶¶ 5, 6. The Video shows the team in tactical gear, the SR Team, as the ones who entered a second team.

Plaintiff relies upon a March 23, 2021 Crime Scene Report (the "CS Report") to establish that these Defendants entered the Apartment a second time. *Id.*; *see also See* Plaintiff Depo., ECF No. [175-3], Ex. 3 at 144, 146, 152, 155–56, 174–75, 196, 204. Review of the CS Report signed by C. Babich and R. Ramlochan confirms that the SR Officers were the ones who responded to and entered the Apartment on the second occasion to locate any additional individuals and check on the welfare of possible additional victims. ECF No. [202], Ex. 17 at 151. After no additional subjects and/or victims were located, [the SR Officers, members of] the Special Team[,] secured the Apartment." *Id.*

Where, as here, "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, the Court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. More importantly, when video evidence "'obviously contradicts the nonmovant's version of facts,'" the court must "'accept the video's depiction instead of the nonmovant's account and view the facts in the light depicted by the videotape." *Baxter v. Roberts*, 54 F.4th 1241, 1253 (11th Cir. 2022) (quoting *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018)). The

undisputed record evidence, including the Video contradicts Plaintiff's version of facts that the PR Officers, and more specifically, Love, Estevez, Reyes, and Waddell, entered the Apartment a second time and beat him unconscious. Although Plaintiff initially insisted that these officers were not wearing "helmets or riot shields" ECF No. [202], Ex. 1 at 6 ¶ 17, he later admits that the officers who did enter the Apartment a second time were part of the SR Team and wore tactical gear, Brown BDU-style pants, tan tactical shirts, black ballistic vests, and helmets. ECF No. [175] at 7 ¶¶ 53–54, 9 ¶ 66. Plaintiff also does not dispute that the SR Officers relieved the PR Officers and took over holding point on the front door of the Apartment. ECF No. [175] at 7 ¶ 55. Further, the Video does not show that the Defendants entered the Apartment a second time. [16]

Thus, when considering the evidence most favorably to Plaintiff, the record evidence supports a finding that the remaining Defendants—Love, Estevez, Reyes, and Waddell—were not SR certified or part of the SR Team and never entered the Apartment on the second occasions when Plaintiff alleges that he was beaten. ECF No. [175] at 9 ¶ 70, 10 at ¶ 84. In fact, Plaintiff concedes that when the SR Officers arrived on the scene, they took over for the PR Officers, holding point outside the Apartment. ECF No. 175] at 7 ¶ 55. Plaintiff's equivocal and often contradictory deposition testimony and affidavit are insufficient to demonstrate a genuine issue of fact. Plaintiff has failed to present sufficient evidence that would allow a reasonable

---

[16] Plaintiff suggests that the video footage has been doctored but provides no facts on how the surveillance footage was doctored, and his mere conclusory allegation is, at best, equivocal and refuted by the record.

jury to infer or find Defendants Love, Estevez, Reyes, and Waddell entered the Apartment a second time and beat Plaintiff unconscious.  As such, these Defendants are also entitled to judgment as a matter of law arising from a claim of unlawful use of force during the second entry into the Apartment.

Because the Court finds no Eighth Amendment violation by Defendants arising from the second entry into the Apartment, they are entitled to qualified immunity.

### IV.  CONCLUSION

Accordingly, for the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. The Defendants' Motion for Summary Judgment, ECF No. [176] is **GRANTED**;

2. Final Judgment in favor of Defendants will follow by way of a separate order;

3. All deadlines and hearings are cancelled;

4.    All pending motions are **DENIED AS MOOT**; and

5.    The Clerk of Court is directed to **CLOSE** this case following entry of the

final judgment.

**DONE AND ORDERED** in Chambers at Miami, Florida on this <u>3rd</u> day of

February, 2026.

_____

JACQUELINE BECERRA
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**

**Julio Juan Garcia,** *Pro Se*
DC#A32071
Sumter Correctional Institution
Inmate Mail/Parcels
9544 County Road 476B
Bushnell, FL 33513

**Erica Sunny Shultz Zaron, Ass't Cnty. Att'y**
Attorney for Defendants
Miami-Dade County Attorney's Office
111 N.W. 1st Street, Suite 2810
Miami, FL 33128
Email: zaron@miamidade.gov